F I L E D
Clerk
District Court

MAY 10 2019

for the Northern Mariana Islands
By_____
(Deputy Clerk)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| REYNALDO ATRERO MANILA,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>ROBERT GUERRERO, JOSE K. PANGELINAN, and GEORGIA M. CABRERA, in their personal capacities,<br><br>　　　　Defendants. | Case No.: 18-cv-00003<br><br>**DECISION AND ORDER ON DEFENDANT GUERRERO AND DEFENDANT CABRERA'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** |

## I.　INTRODUCTION

　　In this civil rights case concerning alleged violations of a prisoner's Eighth Amendment right to adequate medical care, Personal Capacity Defendants Robert Guerrero and Georgia M. Cabrera[1] move to dismiss Pro Se Plaintiff Reynaldo Manila's Second Amended Complaint for failure to state a claim upon which relief can be granted. The Motion to Dismiss (ECF No. 36), brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure, is supported by a Memorandum of Law ("Memo.," ECF No. 37-1). Plaintiff filed an Opposition ("Opp'n," ECF No. 40), and Defendants filed a Reply (ECF No. 43). The matter was heard on May 9, 2019. After affording the parties an opportunity to be heard, the Court granted the Motion to Dismiss in favor of Defendant Guerrero, with leave for Plaintiff

---

[1] Personal Capacity Defendant Jose K. Pangelinan did not join in the motion. References to "Defendants" are to Guerrero and Cabrera only.

1

to amend, and granted it in part and denied it in part with respect to Defendant Cabrera. This Decision and Order sets forth the Court's ruling in writing and memorializes the Court's reasoning.

## II. BACKGROUND

According to the Second Amended Complaint ("SAC," ECF No. 35) and attached documents,[2] the facts that Plaintiff alleges are as follows:

Robert Guerrero was commissioner of the CNMI Department of Corrections ("DOC") when Plaintiff, a DOC inmate serving a CNMI criminal sentence, was diagnosed with retinal detachment in the left eye. (SAC at 1.) In November and December 2015, eye doctors in Saipan repeatedly advised DOC of Plaintiff's urgent need for off-island treatment. (*Id.*) On November 17, Mark Robertson, O.D. (Marianas Eye Institute) recommended, "Emergency referral to Phillipines [*sic*] retinal specialist ASAP!" (Consultation Report, ECF No. 35-3, at 1.) On November 18, Don Hardt, O.D. (Hardt Eye Clinic) wrote a letter "To whom it may concern" stating, "Emergency surgery from a fellowship trained retinal specialist is indicated. [Manila's] prognosis for visual recovery is decreased with each day surgery is delayed." (ECF No. 35-3 at 2.) Hardt also noted that a specialist would be visiting Guam on December 12, but warned that if treatment were delayed until then "the outcome will likely be poor." (*Id.*) On November 19, Dr. Robertson wrote a letter to "Captain Cabrera, Department of Corrections, reiterating his November 17 findings and stating, "While this is not a life-threatening condition, it is very much a vision-threatening one, with each day of delay significantly increasing the

---

[2] In deciding this Rule 12(b)(6) motion, the Court may consider documents such as these, on which Plaintiff relies, because the complaint refers to them, they are central to Plaintiff's claim, and their authenticity is not questioned. *Marder v. Lopez,* 450 F.3d 445, 448 (9th Cir. 2006).

chances that he may totally and permanently loose [*sic*] all vision from his left eye." (ECF No. 35-3 at 3.) On December 17, after examining Plaintiff, Dr. Robertson reported to DOC that the retinal detachment "has progressed to the point where much more vision loss will be permanent. Further delay will eventually lead to TOTAL IRREVERSIBLE BLINDNESS." (Consultation Report, ECF No. 35-3, at 4.)

On December 29, 2015, Attorney Steven P. Pixley wrote a letter to Jose K. Pangelinan, who took over as acting DOC commissioner after Guerrero transferred to the Department of Public Safety. (SAC at 2.) Pixley wrote, "As you are aware, the Board of Parole recently recommended that Mr. Manila's sentence be commuted. I understand that Acting Governor Ralph Torres is reviewing this recommendation now." (ECF No. 35-3, at 5.) Pixley noted that he met with Plaintiff on December 24 and that Dr. Robertson had provided DOC with a report "stressing the extreme urgency of Mr. Manila's medical situation." (*Id.*) He said he was attaching a copy of the report. (*Id.*)

On January 14, 2016, Dr. Robertson examined Plaintiff again and submitted the following findings and recommendations: "Patient is becoming blind in left eye from untreated retinal detachment. As has already been communicated repeatedly, Mr. Manila has a retinal detachment, and any postponement of treatment increases risk of loosing [*sic*] more vision. I see no value in continuing to have him evaluated where treatment is not available. He will need to follow up here after treatment, but full resources NOW should be put toward getting him TREATMENT, not get repeated evaluations where such treatment can not be given." (Consultation Report, ECF No. 35-3, at 6.)

The next day, January 15, Pixley wrote to CNMI Assistant Attorney General John Cook. (ECF 35-3, at 7–8.) In the letter, he noted that it was his understanding that the Office of the Governor was now handling the matter. (*Id.* at 7.) He wrote that DOC "has known that my client will go blind unless

3

he receives off-island surgery for almost two months and no action has been taken to obtain this medical treatment." (*Id*.) He noted DOC's obligation under the Eighth Amendment to provide for serious medical needs and stated: "Unless arrangements are made to obtain off-island treatment for my client on or before January 20, 2016, I will file an action in the United States District Court seeking appropriate relief without further notice." (*Id*. at 8.)

On January 29, 2016, Plaintiff was brought off island for treatment. (SAC at 2.) He returned to Saipan on March 14. (*Id*.) By that time, Defendant Cabrera was DOC commissioner. (*Id*.) On June 21, silicone oil from Plaintiff's left eye was removed by Dr. Eugene Ng on Guam. (*Id*.)

On July 25, Dr. Dennis Williams (Marianas Eye Institute) examined Plaintiff. (SAC at 2.) The reason for the consultation was Plaintiff's complaint of blurry vision in the right eye and a follow-up on the retinal detachment. (Consultation Report, ECF No. No. 35-3, at 9.) Dr. Williams found a cataract in the left eye and recommended cataract surgery. (*Id.*)

On September 19, Dr. Williams wrote a letter to Commissioner Cabrera, noting that "Mr. Manila has a severe and progressing cataract in his left eye due to recent retinal detachment repair and silicone oil removal that was performed in his left eye in February 2016." (ECF No. 35-3, at 10.) He observed that although a cataract is not an eye disease or a life-threatening condition, "vision will continue to worsen as the cataract continues to mature." (*Id*.) He recommended cataract surgery "to help restore clear vision in that eye." (*Id*.) He repeated the recommendation after a consultation on May 17, 2017: "Suggest cataract surgery OS [left eye]." (Consultation Report, ECF No. 35-3, at 11.)

Commissioner Cabrera refused to authorize the surgery. (SAC at 2.) She told Plaintiff that cataract surgery was not necessary because his condition was not life-threatening. (*Id*.) When the next

DOC commissioner, Vince Attao, approved cataract surgery in August 2017, Cabrera (who apparently remained at DOC as a captain) disagreed with his decision. (SAC at 3.) She also refused to give Plaintiff extra toilet paper to wipe his eye. (*Id.*) On November 2, 2017, Plaintiff grieved Cabrera to Commissioner Attao. (SAC at 3; Inmate Grievance, ECF No. 35-3, at 13.)

Plaintiff underwent cataract surgery on September 5, 2017. (SAC at 3.) On October 11, 2017, Dr. Williams told Plaintiff that his prior retinal surgery had been unsuccessful and that he (Williams) would be recommending a consultation with a specialist based in California. (*Id.*)

On January 9, 2018, Dr. David Parks performed eye surgery on Plaintiff at Guam Medical Plaza. (*Id.*) In the SAC, Plaintiff quotes from a report by Dr. Parks that is not in the record: "There was an extensive pucker that associated with subretinal fibrosis. I removed as much of the surface membranes without the subretinal membranes. He should improve but the overall prognosis is just for slight improvement in his vision." (*Id.*) Dr. Robertson examined Plaintiff on May 1, 2018 and told him that he was permanently losing his left eye vision. (*Id.*; no consultation report in the record.) After a consultation on August 7, 2018, Dr. Robertson found "Blindness LE from retinal detachment." (Consultation Report, ECF No. 35-3, at 12.)

### III. LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). The pleading must contain "more than labels and conclusions"; the "[f]actual allegations must be enough to raise a right to relief above a speculative level." *Eclectic Props. East, LLC v. Marcus &*

*Millichap Co.,* 751 F.3d 990, 995 (9th Cir. 2014) (quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A Rule 12(b)(6) dismissal "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1988). Complaints by plaintiffs who are proceeding *pro se,* without a lawyer, must be construed liberally, particularly in civil rights cases, and the court must afford such plaintiffs the benefit of the doubt. *Hebbe v. Pliler,* 627 F.3d 338, 342 (9th Cir. 2010).

## IV. DISCUSSION

The Court begins with an overview of the case law on the Eighth Amendment requirement for adequate medical care of prisoners, and then proceeds to an analysis of the parties' arguments.

1. Eighth Amendment

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173 (1976)). Corrections officers may be liable under 28 U.S.C. § 1983 for conduct "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104–5. However, "an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" *Id.* at 105–6 (quoting *Gregg*, 428 U.S. at 173, and *Palko v. Connecticut,* 302 U.S. 319 (1937)).

The Ninth Circuit has adopted a two-part test for deliberate indifference to a prisoner's serious

medical needs. "First, the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Second, the plaintiff must show that the defendant's response to the need was deliberately indifferent. This second prong—the defendant's response to the need was deliberately indifferent—is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. Indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment . . ." *Jett v. Penner,* 439 F.3d 1091, 1096 (9th Cir. 2006) (cleaned up). Prison administrators "are liable for deliberate indifference when they knowingly fail to respond to an inmate's requests for help." *Id*. at 1098. Plaintiff prisoner is entitled to an inference that prison administrators received letters sent via institutional mail. *Id*. at 1093.

For Eighth Amendment purposes, a prison official is deliberately indifferent only if he or she is subjectively aware of a substantial risk of serious harm to the inmate. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994). "An official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id*. at 838. *Farmer* concerned risks to a prisoner's safety, but its holding has been extended to serious health risks from constitutionally inadequate medical care. To demonstrate deliberate indifference to serious medical needs, "plaintiffs must show that prison officials were (a) *subjectively aware* of the serious medical need and (b) failed to adequately respond." *Rosati v. Igbinoso,* 791 F.3d 1037, 1039 (9th Cir.

2015) (original emphasis; cleaned up).

An extension of the subjective awareness requirement is the principle that under the Eighth Amendment there is no *respondeat superior* liability for supervisors. A supervisor cannot be held liable "for the culpable action or inaction of his or her subordinates." *Starr v. Baca,* 652 F.3d 1202, 1207 (9th Cir. 2011). However, a plaintiff "may state a claim against a supervisor for deliberate indifference based upon the supervisor's knowledge of and acquiescence in unconstitutional conduct by his or her subordinates." *Id.*

2. Claims against Defendant Guerrero

Guerrero maintains that none of Plaintiff's exhibits show that he was subjectively aware of the need for retinal surgery. (Memo. at 4.) None of them are addressed or copied to him. The consultation reports name the requesting DOC medical staff person, none of whom is a named defendant in this case. Furthermore, by statute it is not the Commissioner of the Department of Corrections who is directly responsible for the adult correctional facility in which Plaintiff is housed, but the Director of the Division of Corrections, which operates the facility and is charged with the "care, custody and discipline" of CNMI inmates. (*Id*., citing 1 CMC (N. Mar. I. Code) § 2281–2.) Guerrero points out that the administrative regulations make the Division (not Department) of Corrections "responsible for the health care of the prisoners in its custody." NMIAC § 57-20.1-201. In sum, he argues that it "was not Guerrero's job" to "deal with day to day inmate medical issues," and Plaintiff has not alleged facts indicating that Guerrero had personal knowledge and responsibility. (Memo. at 5.)

In support, Guerrero cites to *Mitchell v. Maynard,* 80 F.2d 1433 (10th Cir. 1996). *Mitchell* concerned liability for injuries from a brutal beating by prison guards. The plaintiff failed to name as

defendants any of the guards who participated in the beating, but named the prison warden and DOC director. *Mitchell*, 80 F.2d at 1441. Noting that "supervisor status by itself is insufficient to support liability[,]" the Tenth Circuit affirmed the district court's dismissal for failure to state a claim because the inmate "failed to sue the parties responsible for the beating and does not allege any personal involvement of the parties before the court[.]" *Id*.

*Mitchell* is readily distinguishable from Manila's case. Unlike an isolated and discrete instance of prisoner abuse by guards, in which there is no reason to believe appointed officials were personally involved, this case concerns protracted neglect of a serious medical need for surgery that would come at significant expense to the government and require transporting the prisoner to another island or another country for treatment. It is plausible to infer that someone higher up than a guard or even a captain would have to make that call. Whereas in *Mitchell* the plaintiff could have been expected to be able to name the guards who beat him or give descriptions leading to their identification, Manila cannot be expected to know which administrator is responsible to approve and arrange off-island medical treatment for inmates. Moreover, it is plausibly alleged, through Pixley's letter to Pangelinan, that by late December 2015 the Manila matter had come to the attention of the parole board and even the governor. If so, it is fair to infer that the DOC commissioner also had personal knowledge.

As to whether the commissioner of the Corrections Department or a subordinate director of the Corrections *Division* had direct responsibility over major medical decisions, this is not a question that can be decided at this stage of the litigation. It is not apparent from statutes and regulations in the public record that the commissioner lacks authority to take control of such a decision and could not in fact have been the ultimate decision maker in this instance. By statute, the commissioner is the top

administrator of the Department of Corrections, 1 CMC § 2852, and the Department is "responsible for *all* adult correctional services." 1 CMC § 2853 (emphasis added). While the day-to-day operation of the adult correctional facility may fall to the director of the Division of Corrections, 1 CMC §§ 2881–2, nothing in the Department of Corrections' enabling statute would prevent the commissioner from taking charge of a major decision concerning medical services, for which by statute he or she is ultimately responsible. Furthermore, the viability of the administrative regulations for the Division of Corrections, to which Guerrero refers for support, has been seriously called into question. The regulations (in title 57 of the Northern Mariana Islands Administrative Code) were promulgated in 1991, when authority for adult corrections was vested in the Department of Public Safety. *See Ray v. Attao,* No. 1:18-cv-00017, 2018 WL 6837746, at *4 (Dec. 31, 2018). In 2004, the legislature created a separate Department of Corrections and gave rulemaking authority to the secretary (since 2007, the commissioner) of the new department. *Id.* at *5. In *Ray,* the CNMI Office of the Attorney General argued persuasively that at least some of those regulations are no longer enforceable. On this record, the Court does not view the Division of Corrections regulations as the final word on who was responsible for prisoner medical services in the CNMI during the period at issue in this case.

Whether Plaintiff's medical crisis had come to the attention of the commissioner already during Guerrero's tenure, which must have ended in late November or early December 2015, is far from clear from the Second Amended Complaint and attached exhibits. Plaintiff's opposition brief, however, alters the picture. It adds a new factual allegation: that Guerrero "arranged a hearing to the Board of Parole for commutation of my sentence. He wants me to get release from D.O.C. custody, so that he will not provide my serious medical need." (Opp'n at 7.) Plaintiff further alleges that Commissioner

Guerrero called him into his office, along with Cabrera, and told him to direct any questions about his medical needs to then-Captain Cabrera, who was involved in arranging for his sentence to be commuted. (*Id.* at 9.) In their reply brief, Defendants construe the Opposition as an attempt at amending the complaint a third time. (Reply, ECF No. 43, at 1.) The Court agrees that these new, material allegations require a further amendment.

Without any clear indication in the actual pleadings that Guerrero was subjectively aware of Manila's condition during the remaining few weeks of his tenure as commissioner, the Second Amended Complaint fails to state a claim against Defendant Guerrero personally and the claim against him must be dismissed. Guerrero concedes that if the complaint is amended a third time to include the new allegations in the Opposition, it may survive a Rule 12(b)(6) motion. (Reply 3.) Therefore, the dismissal will be with leave to amend the complaint to allege Guerrero's role in seeking a commutation of Plaintiff's sentence and his meeting with Guerrero and Cabrera.

3. <u>Claims Against Defendant Cabrera</u>

Cabrera correctly observes that in the Second Amended Complaint, Plaintiff holds her liable for the delay in the cataract surgery, but not the retinal surgery. (Memo. at 5.) All the allegations relate to the time she was DOC commissioner starting in March 2016, after the surgery on Plaintiff's left retina. (*See* SAC at 3.) In the Opposition, Plaintiff tries to shift gears and make out a case against Cabrera for the delay in retinal surgery, too, but the attempt fails. While the alleged meeting with Commissioner Guerrero may at first seem to bolster Plaintiff's claim, it actually works in Cabrera's favor. The new allegations in the Opposition show, not that Cabrera was failing to respond to the medical emergency, but that she was actively involved in trying to get Plaintiff's sentence commuted

pursuant to the Commissioner's instructions so he could travel on his own for treatment. This does not make out a claim of deliberate indifference by Cabrera.

The focus, then, is on the delay in cataract surgery. Defendant Cabrera asserts that Plaintiff's blindness in the left eye is the result of a second retinal tear that was caused by cataract surgery on an eye that had previous repair for a torn retina. (Memo. at 6–7.) The pleadings, including doctors' notes, do not support that narrative. From the Second Amended Complaint: "September 5, 2017, I underwent cataract surgery. On October 11, 2017, Dr. Dennis Williams informed me that my retinal surgery is unsuccessful and he will be sending my medical report to an eye-specialist in California for opinion." (SAC at 3.) The pleadings do not indicate that a second tear occurred as a result of the cataract surgery. Defendant Cabrera cites medical literature, of which he asks the Court to take judicial notice, which states that cataract surgery is a risk factor for retinal detachment. (Memo. at 6.) That may be so, but Plaintiff does not allege a new retinal tear following cataract surgery. Even if it were shown that a new retinal tear was discovered, the fact that cataract surgery poses a risk of tearing the retina would not mean conclusively, at this early stage of the litigation, that Manila's cataract surgery was primarily responsible for the new tear.

Plaintiff complains that he is now blind, but he also clearly complains that he had to wait more than a year for surgery on cataracts that were obscuring his vision. Cataracts in one eye can be a serious medical need, independent of any other condition. *Colwell v. Bannister,* 763 F.3d 1060, 1063 (9th Cir. 2014). Moreover, Commissioner Cabrera's alleged statement that cataract surgery is not a serious medical need because it is not life-threatening may in itself show deliberate indifference if it indicates a blanket DOC policy against cataract surgery. *See id*.

For these reasons, the Motion to Dismiss Defendant Cabrera must be denied as to her role in the delay of Manila's cataract surgery. To the extent Plaintiff seeks to hold her responsible for the delay in retinal surgery and the eventual failure of that surgery, the Motion to Dismiss is granted.

4. <u>Statute of Limitations</u>

In their Reply, for the first time, Defendants raise a statute of limitations defense. (Reply at 3.) For section 1983 claims, the forum state's statute of limitations for personal injury actions applies. *Klein v. City of Beverly Hills,* 865 F.3d 1276, 1278 (9th Cir. 2017). In the CNMI, the period is two years. *See* 7 CMC § 2503; *Pangelinan v. Wiseman,* Civil. No. 08-0004, 2008 WL 11389559, at *4 (D. N. Mar. I. May 8, 2008). Defendants argue that the causes of action accrued no later than December 17, 2015, when Dr. Robertson noted that further delay in repair of the retinal detachment would result in permanent damage. (Reply at 3.) That date is more than two years prior to the docketing of Plaintiff's complaint on February 9, 2018. Defendants assert they are bringing this defense to the Court's attention only now because it was not apparent prior to Plaintiff's Opposition. (*Id.*)

The Court declines to entertain this basis for a Rule 12(b)(6) dismissal. Plaintiff, proceeding without counsel, would need to be given ample opportunity to learn about this legal concept and compose a thoughtful response. Because a statute of limitations defense is not jurisdictional, the Court is not obligated to address it immediately. *Day v. McDonough,* 547 U.S. 198, 205 (2006). The accrual date – the point in time when Plaintiff discovered (or should have discovered) that damage from the delay was irreversible – is not at all clear. The foremost problem with the defense, however, is that it appears Plaintiff wrote a letter to the Court on December 6, 2017, complaining of inadequate treatment of his vision problems, and the Clerk wrote back to him on January 2, 2018, informing him that the

13

Court cannot give legal advice and enclosing forms to file a complaint *in forma pauperis*. (ECF No. 2-2.) From these documents, it appears Plaintiff tried to complain to the Court before the statute of limitations ran, even under Defendants' accrual theory. That said, the Court is not ruling on whether the statute of limitations has run, and Defendants remain free to raise it as an affirmative defense in their responsive pleadings.

## V.   CONCLUSION

For the reasons previously stated, the Court rules as follows:

(1) Defendant Roberto Guerrero's motion to dismiss is GRANTED, with leave for Plaintiff to amend to allege *any and all facts presently in his knowledge* bearing on when and how then-Commissioner Guerrero found out about Plaintiff's need for retinal surgery, and any actions Guerrero took thereupon, including but not limited to the November meeting between Plaintiff, Guerrero, and Cabrera. This is the last opportunity the Court will give Plaintiff to amend his complaint to conform to his best recollection of the relevant events.

(2) Defendant Georgia Cabrera's motion to dismiss is DENIED with respect to the claim concerning delay in cataract surgery and GRANTED with respect to any allegation of liability for the delay in surgery for retinal detachment.

(3) Plaintiff is granted leave to file a Third Amended Complaint consistent with the Court's ruling. **The Third Amended Complaint must be filed within 14 days after Plaintiff receives this Decision and Order.** The Third Amended Complaint will be deemed timely filed if Plaintiff mails it (by placing it in outgoing prison mail or giving it to a corrections officer for mailing) within 14 days after he receives this Decision and Order. <u>Plaintiff must</u>

<u>state, on the first page of the Third Amended Complaint, (1) the date on which he received this Decision and Order and (2) the date he is mailing it</u>. Plaintiff should keep in mind that an amended complaint supersedes all prior complaints, which thereafter are treated as if they did not exist. *Ramirez v. Cnty. of San Bernardino,* 806 F.3d 1002, 1008 (9th Cir. 2015). **Any material in the Second Amended Complaint that Plaintiff wishes to remain part of his pleadings will have to be restated in the Third Amended Complaint. Any previously submitted exhibits (including letters and consultation reports) that Plaintiff wishes to remain before the Court will have to be resubmitted with the Third Amended Complaint.**

(4) All Defendants, including Defendant Jose Pangelinan, must respond to the Third Amended Complaint within the time prescribed by Rule 15(a)(3) of the Federal Rules of Civil Procedure.

IT IS SO ORDERED this 10th day of May, 2019.

/s/ *Ramona V. Manglona*
RAMONA V. MANGLONA
Chief Judge